UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

———————————————————————

SECURITIES AND EXCHANGE
COMMISSION,

        Plaintiff,

    v.                                                      17-CV-971
                                                          DECISION & ORDER

TAREK D. BAHGAT and LAURAMARIE
COLANGELO,

        Defendants,

   and

WEALTHCFO, LLC,

        Relief Defendant.

———————————————————————

On September 28, 2017, the plaintiff, the United States Securities and Exchange

Commission (the "SEC"), filed a complaint in this Court alleging that the defendants

violated the Investment Advisers Act of 1940, 15 U.S.C. §§ 80b-1–80b-21 (the "Advisors

Act").  Docket Item 1.  This Court approved a consent judgment regarding the claims

against defendant Lauramarie Colangelo.  Docket Item 10.  Relief defendant

WealthCFO, LLC ("WealthCFO"), then defaulted, Docket Item 30, and final judgment

was entered on all claims relating to it, Docket Item 34.

Like WealthCFO, the remaining defendant, Tarek D. Bahgat, failed to answer or

otherwise respond to the complaint.  On January 5, 2020, the Clerk of the Court

therefore granted the SEC's request to enter a default against Bahgat under Federal

Rule of Civil Procedure 55(a).  Docket Item 43.  About two weeks later, the SEC moved

under Rule 55(b) for a default judgment against Bahgat.  Docket Item 44.  Specifically, it sought an order (1) permanently enjoining Bahgat from future violations of sections 206(1) and 206(2) of the Advisors Act, 15 U.S.C. §§ 80b-6(1) and 80(b)-6(2); (2) compelling Bahgat to disgorge the $378,021.97 he allegedly misappropriated from his clients, plus prejudgment interest of $73,433.35, for a total of $451,455.32; and (3) imposing civil money penalties under section 209(e) of the Advisers Act, 15 U.S.C. § 80b-9(e).  Docket Item 44-1 at 2.

This Court recognized that the SEC's attempts to serve Bahgat satisfied the procedural requirements of the Federal Rules of Civil Procedure and the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters (the "Hague Convention").  Docket Item 45 at 8-9.  But the Court also found that the attempted service "likely did not comply with constitutional due process requirements."  *Id.* at 11.  So the Court did not reach the merits of the SEC's claims but gave the SEC leave to show cause why its method of service satisfied due process.  *Id.* at 11-12.  And when the SEC failed to do that to the Court's satisfaction, the Court denied the motion for a default judgment.  *See* Docket Item 47 at 2-5.

The SEC has since attempted to serve Bahgat through new means that it claims satisfy due process.  *See* Docket Item 58.  Accordingly, it has renewed its motion for a default judgment.  For the reasons that follow, this Court finds that 1) the SEC has met the constitutional requirements for service; 2) the SEC has adequately and plausibly alleged violations of 15 U.S.C. §§ 80b-6(1) and (2) in its complaint; and 3) equitable considerations weigh in favor of granting a default judgment.  The Court therefore grants the SEC's requests for an injunction prohibiting any future violations of the

Advisors Act by Bahgat, as well as an order requiring disgorgement of the profits that Bahgat misappropriated with prejudgment interest and assessing a civil penalty for Bahgat's misconduct.

## FACTUAL BACKGROUND[1]

Bahgat was an investment advisor and the managing member of WealthCFO, and he was involved in several other investment management companies as well. Docket Item 1 at ¶¶ 1, 9.  Between December 2014 and September 2016, he used his position as a fiduciary to gain unauthorized access to clients' brokerage accounts and transferred funds from those accounts into his own or WealthCFO's accounts.  *Id*. at ¶¶ 1, 2.  In total, Bahgat misappropriated more than $370,000 from seven different individuals.  *Id*. at ¶ 1; Docket Item 44-2 at ¶ 4.

The SEC first attempted to serve Bahgat personally at his last known address in the United States, but Bahgat's former neighbors "told [the process server] that Bahgat had moved to Egypt."  Docket Item 35-1 at 1, 2.  The SEC then sought to serve Bahgat

---

[1] The following facts are taken from the SEC's complaint, Docket Item 1; its motion for a default judgment, Docket Item 44; its response in support of that motion, Docket Item 46; and its brief in further support of that motion, Docket Item 58.  On a motion for default judgment, "[a] defendant's default is . . . 'an admission of all well-pleaded allegations against the defaulting party.'"  *Bricklayers & Allied Craftworkers Loc. No. 3, New York, AFL-CIO (Rochester Chapter) v. Precision Concrete & Masonry, Inc.*, Case # 16-CV-6035-FPG, 2018 WL 4090331, at *2 (W.D.N.Y. Aug. 28, 2018) (quoting *Vt. Teddy Bear Co. v. 1-800 BEARGRAM Co*., 373 F.3d 241, 246 (2d Cir. 2004)).  In addition, the court should "draw all reasonable inferences in favor of the non-defaulting party." *Id*. (citing *Au Bon Pain Corp. v. Artect, Inc*., 653 F.2d 61, 65 (2d Cir. 1981)).  But well-pleaded allegations are not simply accepted when determining damages. *Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp*., 973 F.2d 155, 158 (2d Cir. 1992).  Accordingly, the following allegations from the complaint are construed as admissions, and all reasonable inferences from them are drawn in the SEC's favor, only for the purpose of determining Bahgat's liability.

in Egypt in accordance with the Hague Convention.  *See id*. at 2 (attempted service via the Egyptian Ministry of Justice at Bahgat's address in Egypt—an address confirmed by Bahgat's adult daughter).  The Egyptian Ministry responded, however, that it was unable to locate or serve Bahgat at the address provided.  *Id*.

After the SEC learned that Bahgat may have used an email address to communicate with his daughter*, id*. at 2, 3, it sought and was granted leave to serve Bahgat via email, *see* Docket Items 35, 38.  But the Court nevertheless denied the SEC's motion for a default judgment because that service did not satisfy due process considerations.  Docket Item 47.

The SEC then filed a letter renewing its request for alternative service.  Docket Item 54.  In the letter, the SEC advised the Court that it had retained an Egyptian lawyer, Dr. Tarek F. Riad, who could ensure attempted service through an Egyptian court bailiff under Egyptian law.  *Id*.  This Court granted the request, finding that the described method met the requirements of the Federal Rules of Civil Procedure and Hague Convention, but waited for the service to be executed before ruling on whether the method met constitutional requirements.  Docket Item 55 at 4.

The SEC has since attempted service by that method, but it still did not successfully deliver the documents to Bahgat.  *See generally* Docket Item 58.  So the SEC submitted a brief outlining its efforts to serve Bahgat through the method suggested by Dr. Riad, supported primarily by a letter from Dr. Riad detailing his actions.  *See* Docket Item 58-2.

In the letter, Dr. Riad states that his associate surveilled an apartment in which Bahgat was believed to be living and asked neighboring businesses and residents

whether they recognized a photo of Bahgat.  *Id*. at 2, 3.  After a neighbor told the associate that Bahgat was living in an apartment on the third floor, the associate visited that apartment and had a brief conversation with Bahgat.  *Id*.  But the associate did not tell Bahgat the reason for the visit.  *Id*.

A few days later, another associate and the Egyptian bailiff returned to the apartment and attempted to serve Bahgat.  *Id*. at 3, 4.  They spoke with a child and a woman who claimed to be Bahgat's ex-wife, and they were told that Bahgat does not live at the apartment.  *Id*. at 4.

Several days later, the associate and bailiff tried again and spoke with a woman who claimed to be the maid; she told them that Bahgat lived in the apartment but was out with his wife at the time.  *Id*. at 5.  They asked her to call him and tell him that he needed to return to receive some documents from the United States.  *Id*.  The maid closed the door, and when she returned, she said that she was unable to reach Bahgat. *Id*.  The associate and bailiff then suggested she call Bahgat's wife.  *Id*.  The maid closed the door again; when she returned this time, she said that Bahgat did not live in the apartment and that they should leave.  *Id*.

The bailiff then prepared a notification to be delivered to the apartment's address, pursuant to Egyptian law, asking Bahgat to take delivery of the documents from the police station.  *Id*.  According to Dr. Riad, this completes the Egyptian service process. *Id*. at 6.  Later, a bailiff at the police station informed one of Dr. Riad's associates that an attorney had come to the station on Bahgat's behalf and had objected to the attempts at service.  *Id*.

## LEGAL PRINCIPLES

Rule 55 of the Federal Rules of Civil Procedure outlines the multi-step process for obtaining a default judgment.  *See generally Enron Oil Corp. v. Diakuhara*, 10 F.3d 90, 95 (2d Cir. 1993).  Rule 55(a) provides that "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default."  Then, if the plaintiff seeks a judgment for an amount other than a "sum certain" as is the case here, Rule 55(b) requires the plaintiff to "apply to the court for a default judgment." Deciding whether the plaintiff is entitled to that judgment, in turn, involves a multi-pronged analysis addressing (1) legal liability, (2) equitable considerations, and (3) the calculation of damages.

As this Court previously noted, however, before addressing the merits of a motion for a default judgment, a district court may in its discretion—and perhaps must—assess the sufficiency of service.  *See* Docket Item 45 at 4 n.1 (citing *Sinoying Logistics Pte Ltd. v. Yi Da Xin Trading Corp*., 619 F.3d 207, 213 (2d Cir. 2010) ("[W]e agree with our sister circuits that before a court grants a motion for default judgment, it may first assure itself that it has personal jurisdiction over the defendant.");  *Mwani v. bin Laden*, 417 F.3d 1, 6 (D.C. Cir. 2005) ("[A] court should satisfy itself that it has personal jurisdiction before entering judgment against an absent defendant.")).  Indeed, "when entry of a default judgment is sought against a party who has failed to plead or otherwise defend, the district court has an affirmative duty to look into its jurisdiction both over the subject matter and the parties."  *Williams v. Life Sav. & Loan*, 802 F.2d 1200, 1203 (10th Cir. 1986) (per curiam).

Once the court is satisfied that it has jurisdiction, it then determines whether "liability is established as a matter of law when the factual allegations of the complaint are taken as true." *Bricklayers & Allied Craftworkers*, 779 F.3d at 187 (citing *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 137 (2d Cir. 2011)).  "[I]t [is] the plaintiff's burden to demonstrate that those uncontroverted allegations, without more, establish the defendant's liability on each asserted cause of action." *Gunawan v. Sake Sushi Rest.*, 897 F. Supp. 2d 76, 83 (E.D.N.Y. 2012) (collecting cases).  "A court should not grant a motion for default judgment simply because a plaintiff alleges in a conclusory fashion that a defendant has violated the law.  Instead, the factual allegations in support of default judgment must establish plausible grounds for relief." *SEC v. Dang*, No. 3:20-cv-01353 (JAM), 2021 WL 1550593, at *4 (D. Conn. Apr. 19, 2021).

If the plaintiff has adequately stated a claim, the court then considers whether the equities favor the entry of a default judgment.  In making that determination, "[c]ourt[s] [are] guided by the same factors [that] apply to a motion to set aside entry of a default." *Rodriguez v. Almighty Cleaning, Inc.*, 784 F. Supp. 2d 114, 123 (E.D.N.Y. 2011).  Those factors include "(1) whether the default was willful; (2) whether setting aside the default would prejudice the adversary; and (3) whether a meritorious defense is presented." *Enron*, 10 F.3d at 96 (citations omitted).

Finally, if a court determines that entry of a default judgment is legally and equitably appropriate, it determines damages.  Although a party's default "is deemed to constitute a concession of all well[-]pleaded allegations of liability," it "is not considered an admission of damages." *Greyhound Exhibitgroup*, 973 F.2d at 158.  "The district

court [therefore] must . . . conduct an inquiry in order to ascertain the amount of damages with reasonable certainty." *Credit Lyonnais Sec. (USA), Inc. v. Alcantara*, 183 F.3d 151, 155 (2d Cir. 1999) (citation omitted).  And in doing so, "the court may conduct a hearing or order a reference."  *Enron*, 10 F.3d at 95 (citing Fed. R. Civ. P. 55(b)(2)).

"The dispositions of motions for . . . default judgments . . . are left to the sound discretion of a district court."  *Id*. at 95.  But as a rule, "defaults are generally disfavored and are reserved for rare occasions."  *Id*. at 96; *cf. New York v. Green*, 420 F.3d 99, 104 (2d Cir. 2005) (characterizing a default judgment as "the most severe sanction [that a] court may apply" and explaining that "[the Second Circuit] ha[s] expressed a strong preference for resolving disputes on the merits") (citations omitted).

## DISCUSSION

Applying the above analysis, this Court finds that the SEC is entitled to the default judgment it requests.  More specifically, and for the reasons that follow, the Court finds that the SEC's latest attempt to serve Bahgat satisfies due process; that the complaint adequately alleges a violation of 15 U.S.C. §§ 80b-6(1) and (2); and that the equities weigh in favor of granting a default judgment.  Moreover, based upon the SEC's submissions, the Court finds that Bahgat should be enjoined from future violations of the Advisors Act; that by misappropriating his clients' funds, Bahgat improperly profited in the amount of $378,021.97; that prejudgment interest totals $73,433.35;[2] and that a third-tier civil money penalty against Bahgat is warranted as well.

---

[2] This prejudgment interest figure was derived from the SEC's initial default judgment motion papers, filed on January 21, 2020.  *See* Docket Item 44.  The SEC may seek additional prejudgment interest for the time that has passed since this figure

I.      **Service of Process**

To determine whether a defendant has been properly served abroad, courts look to 1) the procedural requirements of the Federal Rules of Civil Procedure and the Hague Convention and 2) the constitutional requirements of the Fourteenth Amendment's Due Process Clause. *See Burda Media, Inc. v. Viertel*, 417 F.3d 292, 303 (2d Cir. 2005). This Court previously found that the SEC's second proposed attempt to serve Bahgat through an Egyptian court bailiff under Egyptian law met the procedural requirements of both Rule 4 and the Hague Convention, but it reserved judgment on the constitutionality of service until it was actually executed. Docket Item 55 at 4. The SEC has since attempted service by this method, and it argues that it has met the Fourteenth Amendment's requirements. *See generally* Docket Item 58. This Court agrees.

For service to satisfy the Fourteenth Amendment, "[d]ue process requires 'notice reasonably calculated . . . to apprise interested parties of the pendency of the action.'" *Burda Media*, 417 F.3d at 303 (quoting *Mullane v. Central Hanover Bank & Trust Co*., 339 U.S. 306, 314 (1950)). The court can factor into that equation whether the defendant appears to be intentionally avoiding service. *See Walsh v. Denis*, Civ. No. 3:16CV00945(AWT), 2017 WL 819957, at *3 (D. Conn. Mar. 2, 2017) ("The Court finds that the method of service proposed by plaintiff comports with constitutional notions of due process . . . . This is particularly true where, as here, defendant appears for all

---

was first calculated. *See SEC v. First Jersey Sec., Inc*., 890 F. Supp. 1185, 1211 (S.D.N.Y. 1995) (awarding prejudgment interest "to be updated to the date of the final judgment to be submitted herein"), *aff'd in relevant part,* 101 F.3d 1450 (2d Cir. 1996). Accordingly, if the SEC seeks additional prejudgment interest, it may apply to this Court for such an award within 14 days.

intents and purposes to be avoiding service of process in this District.").  As for the facts

of service, "[a] process server's sworn statement of service creates a presumption that

service has been effectuated in the manner so described."  *Voice Tele Servs. v. Zee*

*Telecoms Ltd.*, 338 F.R.D. 200, 204 (S.D.N.Y. 2021) (citing *Old Republic Ins. Co. v.*

*Pac. Fin. Servs. of Am., Inc.*, 301 F.3d 54, 57 (2d Cir. 2002)).

     The service effected here satisfies due process for two reasons.  First, attempted

service consistent with a foreign country's prescribed methods has been found to meet

the Fourteenth Amendment's due process requirements when it provides the defendant

with actual notice of the complaint.  *See Burda Media*, 417 F.3d at 303 ("Burda's service

of process by personal delivery through the French authorities easily meets [the due

process] standard . . . ."); *Gurung v. Malhotra*, 279 F.R.D. 215, 218 (S.D.N.Y. 2011) ("As

the Second Circuit has explained, when service through a Central Authority fails, means

of service that provide a defendant with actual notice of the complaint are sufficient to

satisfy due process and Rule 4.") (citing *Burda Media*, 417 F.3d at 301); *Voice Tele*

*Servs. v. Zee Telecoms Ltd.*, 338 F.R.D. 200, 204 (S.D.N.Y. 2021) (service satisfying

United Kingdom law comports with due process when the defendant regularly retrieved

mail at the location the summons was left); *see also United Student Aid Funds, Inc. v.*

*Espinosa*, 559 U.S. 260, 272 (2010) (despite the "failure to serve United with a

summons and complaint" for a bankruptcy proceeding, "*actual* notice of the filing and

contents of [bankruptcy plan] . . . more than satisfied United's due process rights")

(emphasis in original).  Here, the attempted service under Egyptian law gave Bahgat

notice of at least the existence of a legal action through his wife or ex-wife, his maid,

and the lawyer who went to the police station on his behalf.  That notice, especially

when coupled with Bahgat's avoidance of service, meets any due process requirements.

Second, service of a foreign defendant through his attorney has been found to meet constitutional service requirements. *RSM Prod. Corp. v. Fridman*, No. 06 Civ. 11512(DLC), 2007 WL 2295907, at *4 (S.D.N.Y. Aug. 10, 2007) ("[W]here plaintiffs have been unable, despite diligent efforts, to serve the defendant in the Russian Federation according to Hague Service Convention procedures, substituted service on [the defendant] through [his attorney] accomplishes the goals of service while respecting the requirements of both due process and Rule 4(f)(3)."); *SEC v. Shehyn*, No. 04 Civ.2003(LAP), 2008 WL 6150322, at *3 (S.D.N.Y. Nov. 26, 2008) (due process satisfied through publication and delivery to defendant's attorney). Here, a lawyer went to the police station on Bahgat's behalf to contest service and supposedly met with the bailiff as well. Docket Item 58-2 at 6. Although Bahgat's attorney was not actually served with process on either of those occasions, the lawyer's knowledge of the suit still weighs in favor of finding that due process was satisfied.

And the Court finds that Dr. Riad's letter is sufficient to support these findings. That letter asserts that service was attempted twice at an apartment where an associate of Dr. Riad personally met Bahgat, *id*. at 2; that a neighbor and the apartment's housemaid both said that Bahgat lived at the apartment, *id*. at 3, 5; and that Bahgat's ex-wife and the maid both were told that important documents from the United States needed to be delivered to him personally*, id*. at 4, 5. That same letter includes the opinion of a practicing Egyptian lawyer that the efforts to serve Bahgat were sufficient to establish valid service in Egypt. *Id*. at 6. Therefore, and because the attempted service

met Egyptian procedural requirements and likely provided Bahgat with actual notice of the lawsuit, the SEC has shown that service was sufficient to satisfy the Fourteenth Amendment.  *See Voice Tele Servs.*, 338 F.R.D. at 204 (actual knowledge of lawsuit and service at location where the defendant usually received mail, pursuant to United Kingdom law, was sufficient due process).[3]

Although Dr. Riad's letter is not a "sworn statement of service" and therefore does not give rise to the "presumption that service has been effectuated in the manner so described," *Voice Tele Servs.*, 338 F.R.D. at 204 (citing *Old Republic*, 301 F.3d at 57), it comes from an attorney admitted to practice in New York State and therefore an officer of the court.  *See* Docket Item 58-10 at 2.  Moreover, the allegations make clear that Bahgat is intentionally avoiding service, another reason to find that he knows what is going on and that due process has been satisfied.  *Walsh*, 2017 WL 819957, at *3.

For all those reasons, this Court finds that the SEC's attempt to personally serve Bahgat in Egypt, followed by service through mail to his residence under Egyptian law, was "reasonably calculated . . . to apprise [Bahgat] of the pendency of the action.'" *Burda Media*, 417 F.3d at 303 (quoting *Mullane*, 339 U.S. at 314).  The SEC therefore has met the requirements of the Due Process Clause of the Fourteenth Amendment in serving Bahgat.

---

[3] Not only do these facts indicate Bahgat had actual notice of the lawsuit, but text messages from Bahgat's daughter submitted in the SEC's previous filings (Docket Item 46 at 3) suggest that Bahgat already knew about the SEC action filed against him before the renewed attempt to serve him.

## II.     Merits of Claims

Moreover, the facts pleaded in the complaint, accepted as true, adequately establish Bahgat's liability for violating 15 U.S.C. §§ 80b-6(1) and (2).  That statute proscribes fraud or deceit by investment advisors, and the complaint adequately alleges both that Bahgat was an investment adviser and that he defrauded clients as prohibited by the statute.

The Advisors Act defines an investment advisor, in relevant part, as "any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities . . . ."  15 U.S.C. § 80b-2(a)(11).  The complaint alleges that Bahgat was the managing member or investment advisor at multiple companies, including WealthCFO.  Docket Item 1 at ¶ 9.  It also alleges that, at the relevant time, he was a registered representative of an SEC-registered broker-dealer and investment adviser.  *Id*. at ¶ 10.  Accepting these well-pleaded allegations as true, *Vt. Teddy Bear Co*., 373 F.3d at 246, the SEC has adequately established that Bahgat was an investment advisor within the meaning of the Advisors Act and therefore subject to 15 U.S.C. §§ 80b-6(1) and (2).

15 U.S.C. § 80b-6 provides that "[i]t shall be unlawful for any investment adviser, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly—(1) to employ any device, scheme, or artifice to defraud any client or prospective client; [and] (2) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client . . . ."  U.S.C. § 80b-6(1), (2); *United States v. Bergstein*, 788 F. App'x 742, 747 (2d Cir. 2019).  A claim

under 15 U.S.C. § 80b-6(1) also requires a showing of scienter.  *SEC v. Westport Capital Mkts. LLC*, 408 F. Supp. 3d 93, 105 (D. Conn. 2019).  Therefore, the SEC must show that Bahgat acted intentionally, knowingly, or recklessly with respect to that claim.  *Id*.[4]  "Proof of scienter under the securities laws need not be direct, but may be a matter of inference from circumstantial evidence."  *Valicenti Advisory Servs. v. SEC*, 198 F.3d 62, 65 (2d Cir. 1999) (internal quotations omitted) (quoting *Wechsler v. Steinberg*, 733 F.2d 1054, 1058 (2d Cir. 1984)).

The complaint adequately alleges that Bahgat violated both these provisions.  For example, the complaint details how Bahgat called multiple broker-dealers, on multiple occasions, to transfer his clients' funds into WealthCFO or his own personal account*, see generally* Docket Item 1, and that none of these transfers were authorized*, id*. at ¶¶ 20, 23, 31, 37, 47, 56.  So the SEC has clearly established that Bahgat utilized a "scheme . . . to defraud [his] client[s]" and engaged in multiple "transactions . . . operat[ing] as a fraud or deceit upon [his] client[s]."  15 U.S.C. § 80b-6.  And because Bahgat's actions were deliberate and repeated, it is more than reasonable to infer that he acted with the requisite intent to steal his clients' money.  *See* Docket Item 1 at ¶ 63; *Au Bon Pain Corp.*, 653 F.2d at 65 (all reasonable inferences must be drawn in favor of non-defaulting party).  Therefore, the SEC has established that Bahgat is liable for violating 15 U.S.C. §§ 80b-6(1) and (2).  *See SEC v. Penn*, 225 F. Supp. 3d 225, 237 (S.D.N.Y. 2016) ("Penn's admitted scheme to defraud establishes each of the elements of a claim under [15 U.S.C. §§ 80b-6(1) and (2)].  There is no dispute that Penn was

---

[4] Scienter is not required for the SEC's 15 U.S.C. § 80b-6(2) claim.  *Dembski v. SEC*, 726 F. App'x 841, 844 (2d Cir. 2018) ("[s]cienter is required for a [§ 80b-6(1)] violation but need not be found for a violation of [§ 80b-6(2)]").

acting as an investment adviser . . . and he has admitted to managing the Fund. Penn also admitted that he diverted $9.3 million from the Fund . . . . That scheme was inherently deceptive. Penn's scheme also satisfies the scienter requirement . . . ."); *see also SEC v. Genovese*, 553 F. Supp. 3d 24, 44 (S.D.N.Y. 2021) (finding violation of 15 U.S.C. §§ 80b-6(1) and (2) based on allegations in complaint under the default judgment standard); *Dang*, 2021 WL 1550593, at *4 (same).

### III. Equitable Factors

Because Bahgat has defaulted after he was served with a complaint that adequately alleges violations of the Advisors Act, this Court turns to whether the equities favor a default judgment. *Enron*, 10 F.3d at 96. And they do.

As noted above, in deciding whether the equities favor a default judgment, the court considers "(1) whether the default was willful; (2) whether setting aside the default would prejudice the adversary; and (3) whether a meritorious defense is presented." *Id.* (citations omitted). Willfulness includes "conduct that is more than merely negligent or careless," and a finding of willfulness is appropriate "where the conduct of counsel or the litigant was egregious and was not satisfactorily explained." *SEC v. McNulty*, 137 F.3d 732, 738 (2d Cir. 1998) (citation omitted). Conduct that is deliberate or done in bad faith meets this standard. *Gucci Am., Inc. v. Gold Ctr. Jewelry*, 158 F.3d 631, 635 (2d Cir. 1998) ("Thus, while a determination that the defendant acted in bad faith would certainly support a finding of 'willfulness,' it is sufficient that the defendant defaulted deliberately.").

Deliberately avoiding service or simply ignoring a complaint weighs in favor of granting a default judgment. *Merrill Lynch Bus. Fin. Servs., Inc. v. Suri Interiors, Inc.*, No. CV-88-2973, 1989 WL 5261, at *1 (E.D.N.Y. Jan. 20, 1989) ("In considering whether a default was willful, a court should consider a party's 'abuse of the legal system' and 'obstructionist tactics.' Defendants' efforts to avoid service and failure to file an answer after service was effected establish[] willfulness.") (internal citations omitted) (quoting *In re Men's Sportswear, Inc.*, 834 F.2d 1134, 1139 (2d Cir. 1987)); *Staples, Inc. v. W.J.R. Assocs.*, No. 04CV0904SJ, 2005 WL 820496, at *3 (E.D.N.Y. Apr. 7, 2005) ("Courts have held defaults to be willful when a defendant simply ignores a complaint without action . . . .") (quotations omitted). "Notably, the willfulness inquiry can be decisive: once a court finds that a party willfully defaulted, 'there is no need to consider whether [that party] had meritorious counterclaims and the possible prejudice [to other parties] . . . if the default judgment is vacated.'" *United States v. Chesir*, 862 F. Supp. 2d 286, 290 (E.D.N.Y. 2012) (quoting *Advanced Portfolio Techs., Inc. v. Advanced Portfolio Techs. Ltd.*, No. 94 Civ. 5620(JFK), 2002 WL 562650, at *7 (S.D.N.Y. Apr. 15, 2002)).

Here, Bahgat's conduct suggests that he has been deliberately avoiding service despite actual knowledge of the SEC's action against him. As discussed above, text messages with his daughter and the circumstances of the SEC's repeated attempts to serve him support the inescapable inference that Bahgat knows that the SEC has filed a complaint against him and is working hard to avoid being served with that complaint. *See* Docket Item 46 at 3; Docket Item 58-2 at 4-6. Indeed, his abrupt move to Egypt and his elusiveness during the SEC's service efforts underscore that conclusion. This

Court therefore finds that Bahgat's default was willful, and that weighs strongly in favor of granting a default judgment.

The potential prejudice to the SEC adds to that weight. Prejudice requires showing more than "delay alone": the delay must be causing the loss of evidence, creating increased difficulties in discovery, or providing an opportunity for fraud and collusion. *Davis v. Musler*, 713 F.2d 907, 916 (2d Cir. 1983). Here, the SEC seeks an injunction prohibiting Bahgat from violating the Advisers Act in the future. *See infra* at Section IV(a). Any delay in imposing this injunction, combined with the apparent difficulty in keeping track of Bahgat, increase the opportunity for future fraud. And given Bahgat's thus-far successful efforts to avoid service, this Court can see no good reason to delay judgment against him. Therefore, this factor also weighs in favor of granting a default judgment.

Finally, this Court knows of no meritorious defenses that Bahgat might have. To present a meritorious defense, "the defendant need not establish his defense conclusively, but he must present evidence of facts that, 'if proven at trial, would constitute a complete defense.'" *McNulty*, 137 F.3d at 740 (quoting *Enron*, 10 F.3d at 98) (additional citation omitted). Bahgat obviously has not presented evidence of any facts—he has not even appeared to defend this action—and this Court's review of the record does not suggest any apparent defenses.

Therefore, all three factors weigh in favor of a default judgment, and this Court grants the SEC's motion. But the question of what relief the SEC is entitled to remains.

## IV.   Relief

The SEC seeks an order (1) permanently enjoining Bahgat from future violations of 15 U.S.C. §§ 80b-6(1) and 80(b)-6(2); (2) disgorging Bahgat of the $378,021.97 that he misappropriated from his clients, plus $73,433.35 in prejudgment interest; and (3) imposing the maximum civil monetary penalty under 15 U.S.C. § 80b-9(e).  Docket Item 44-1 at 2.  As noted above, Bahgat's default is "not considered an admission of damages."  *Greyhound Exhibitgroup*, 973 F.2d at 158.  So this Court must decide what relief is warranted and "conduct an inquiry in order to ascertain the amount of damages with reasonable certainty."  *Credit Lyonnais*, 183 F.3d at 155 (citation omitted).

Based on the SEC's submissions, including those in support of its default judgment motion, this Court finds that the injunction against future Advisors Act violations is appropriate.  The SEC has also established with reasonable certainty that it is entitled to a judgment in the amount of the requested disgorgement and prejudgment interest.  Finally, this Court will impose a civil monetary penalty against Bahgat in the amount of $378,854—that is, $189,427 for each of the two violations of the Advisors Act.

### a.  Injunction Against Future Violations

The Advisers Act provides that "[w]henever it shall appear to the [SEC] that any person has engaged . . . in any act or practice constituting a violation of any provision of [15 USCS §§ 80b-1 *et seq*.], . . . it may in its discretion bring an action in the proper district court of the United States, . . . to enjoin such acts or practices and to enforce compliance with this title."  15 U.S.C. § 80b-9(d).  "The critical question for a district court in deciding whether to issue a permanent injunction in view of past violations is

18

whether there is a reasonable likelihood that the wrong will be repeated." *SEC v. Penn*, No. 14-CV-0581 (VEC), 2020 WL 1272285, at *5 (S.D.N.Y. Mar. 17, 2020) (quoting *SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1100 (2d Cir. 1972)).  In determining the likelihood of a future offense, "a district court may consider: (1) the egregiousness of the violation; (2) the degree of scienter; (3) the isolated or repeated nature of the violations; and (4) the sincerity of defendant's assurances against future violations." *SEC v. Haligiannis*, 470 F. Supp. 2d 373, 384 (S.D.N.Y. 2007) (citing *SEC v. Cavanagh*, 155 F.3d 129, 135 (2d Cir. 1998)).  When a defendant defaults in an action, the court may assess the appropriateness of an injunction—in contrast to money damages— based on the allegations in the complaint.  *See SEC v. Riel*, 282 F. Supp. 3d 499, 531 (N.D.N.Y. 2017) (granting injunction for violation of securities law against defaulting defendant based on allegations in the complaint); *SEC v. Syndicated Food Servs. Int'l, Inc.*, No. 04-CV-1303 (NGG)(ALC), 2010 WL 4668777, at *1 (E.D.N.Y. Nov. 9, 2010) (granting injunction after "[a]ccepting all the allegations in the Complaint as true").

All four factors weigh in favor of an injunction here.  To begin, transferring money that belonged to clients into an investment advisor's own account is egregious.  And the SEC says that Bahgat did that to seven clients over almost two years.  *See* Docket Item 1 at ¶¶ 18, 22, 30, 36, 46, 53-55 (alleging that seven clients were defrauded over roughly two-year period); Docket Item 44-2 at ¶ 4 ($378,021.97 misappropriated from clients in total).  So the egregiousness of the violations and the fact that they were repeated over a long period of time counsel in favor of an injunction.  *See Dang*, 2021 WL 1550593, at *6 ("While [the] action against Dang involve[d] only Dang's conduct with regard[] to two clients, Dang's lies and omissions with regard to his relationship with

19

those two clients" were sufficiently egregious "to weigh in favor of granting a permanent injunction . . . ."); *SEC v. Zwick*, No. 03 Civ. 2742(JGK), 2007 WL 831812, at *21 (S.D.N.Y. Mar. 16, 2007) (20 fraudulent trades over 16 months considered sufficiently repetitive).

Moreover, because Bahgat has defaulted and apparently fled, there is no reason to believe that he will not violate in the future, and the Court does not know the current status of his practice. So an injunction may well be necessary to protect unwary investors. *See SEC v. Rinfret*, No. 19-cv-6037 (AJN), 2020 WL 6559411, at *5 (S.D.N.Y. Nov. 9, 2020) ("[B]ecause [d]efendants have not appeared in this litigation, despite being properly served with both the [c]omplaint and the SEC's default-judgment papers, there is no representation before this Court that this conduct will not reoccur or that [d]efendants have recognized the wrongful nature of their behavior."); *Riel*, 282 F. Supp. 3d at 531 (granting injunction for violation of securities laws against defaulting defendant in part because the defendant "ha[d] defaulted in this action and, therefore, ha[d] not recognized the wrongful nature of its conduct and ha[d] made no assurances against future violations."); *SEC v. China Energy Sav. Tech., Inc.*, No. 06-CV-6402 (ADS)(AKT), 2008 WL 6572372, at *8 (E.D.N.Y. Mar. 28, 2008) ("[W]here, as here, a party has failed to appear, that party fails to recognize his wrongdoing and provide assurances against further violations. In such circumstances, an injunction is appropriate.").

Likewise, Bahgat acted with the fraudulent goal of misappropriating his clients' funds. Docket Item 1 at ¶ 63. Accordingly, the high degree of scienter weighs in favor of an injunction. *See China Energy Sav.*, 2008 WL 6572372, at *8 (assessing scienter

20

for purposes of imposing civil penalty against defaulting defendants, finding that "since the allegations of the [c]omplaint are accepted as true . . . . Chiu and Sim are alleged to have orchestrated the entire scheme and wore multiple hats at multiple entities over the course of the two-year period in question.  The violations of the securities laws . . . involved the highest degree of scienter.").

For all those reasons, an injunction is appropriate, and this Court grants the SEC's request for a permanent injunction enjoining Bahgat from future violations of 15 U.S.C. §§ 80b-6(1) and (2).

### b. Disgorgement and Prejudgment Interest

The SEC also seeks disgorgement of the $378,021.97 that it says Bahgat took from his clients as well as $73,433.35 in prejudgment interest.  Docket Item 44-1 at 7-10.  "[A] district court has broad discretion not only in determining whether or not to order disgorgement but also in calculating the amount to be disgorged."  *First Jersey*, 101 F.3d at 1474-75.  Nevertheless, the amount must be calculated "with reasonable certainty."  *Credit Lyonnais*, 183 F.3d at 155.

Here, the SEC has demonstrated with reasonable certainty that Bahgat misappropriated $378,021.97 from his clients' accounts.  The SEC has provided the Court with a table that includes every transfer from the accounts of Bahgat's various clients to either WealthCFO's account or to Bahgat's own account.  *See* Docket Item 44-2 at ¶ 3.  The unauthorized transfers total $378,021.97,[5] *id.,* and there is no reason

---

[5] Bahgat is jointly and severally liable with WealthCFO for $369,601.97 of the $378,021.97 total.  Courts may impose joint and several liability on an individual for profits disgorged from a firm when the individual collaborated with and ranks high in the

to doubt the accuracy of this exhibit, which the SEC supports with records that document each transfer.  *See* Docket Item 32-4; Docket Item 44-4.

The SEC also is entitled to prejudgment interest.  District courts have "broad discretion" to determine whether prejudgment interest should be awarded.  *First Jersey*, 101 F.3d at 1476.  "Payment of prejudgment interest is necessary to ensure a defendant does not benefit from 'what amounts to an interest free loan procured as a result of illegal activity.'"  *SEC v. Wheeler*, 56 F. Supp. 3d 241, 245 (W.D.N.Y. 2014) (quoting *SEC v. Moran*, 944 F. Supp. 286, 295 (S.D.N.Y. 1996)).  For that reason, this Court finds that an award of prejudgment interest is appropriate here.

The SEC has used the Internal Revenue Service underpayment rate in 26 U.S.C. § 6621(a)(2) to calculate interest for each monthly unauthorized transaction, and that rate is appropriate.  *See First Jersey*, 101 F.3d at 1476 ("courts have approved the use of the IRS underpayment rate in connection with disgorgement"); *Wheeler*, 56 F. Supp. 3d at 245-46 (noting that "the interest rate used by the Internal Revenue Service for underpayment of federal income tax" is "a method of interest calculation approved by the Second Circuit").  Based on those calculations, the Court awards prejudgment interest in the amount of $73,433.35.[6]  *See* Docket Item 44-5.

firm.  *First Jersey*, 101 F.3d at 1475 ("[W]here a firm has received gains through its unlawful conduct, where its owner and chief executive officer has collaborated in that conduct . . . it is within the discretion of the court to determine that the owner-officer too should be subject, on a joint and several basis, to the disgorgement order.").  WealthCFO disgorged $369,601.97, which Bahgat transferred to its account.  Docket Item 34.  Therefore, Bahgat is jointly and severally liable with WealthCFO for that amount.

[6] As noted above, *see supra* n.2, the SEC may apply for additional prejudgment interest within 14 days.  Also as discussed above, considering Bahgat's involvement with WealthCFO, Bahgat is jointly and severally liable for $39,803.65 of the prejudgment

### c. Civil Penalty

Finally, the SEC seeks an order imposing the maximum civil penalty on Bahgat. Docket Item 44-1 at 10-12. Civil penalties are intended not only to punish the violator but also to deter future violations. *Haligiannis*, 470 F. Supp. 2d at 386; *SEC v. Illarramendi*, 260 F. Supp. 3d 166, 183 (D. Ct. 2017). To accomplish this goal, the Advisers Act includes three tiers of penalties, increasing in severity, based on the "facts and circumstances" of the violation. 15 U.S.C. § 80b-9(e)(2). A first-tier penalty—capped at $5,000—applies to any violation; a second tier penalty—capped at $50,000—applies to a violation that involved "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement"; and a third-tier penalty—capped at $100,000—applies to a violation that meets the second tier requirements and also "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to the other persons." 15 U.S.C. § 80b-9(e)(2)(A)-(C). Because the caps are periodically adjusted for inflation under 17 CFR § 201.1001, the maximum penalty this Court can impose is $160,000 for violations occurring from March 6, 2013, through November 2, 2015, and $189,427 for violations occurring after November 2, 2015.

Here, Bahgat's conduct clearly involved "fraud, deceit, [and] manipulation," satisfying the second-tier criteria. *See* Docket Item 1 at ¶¶ 19, 22, 30, 36, 44, 46, 53-55; Docket Item 22 at 5 (finding that "[t]he facts of the complaint clearly support[ed] at least a second[-]tier penalty" against Colangelo, who played a much smaller role in the fraud

---

interest total—that is, the amount of prejudgment interest that WealthCFO already has been ordered to pay. Docket Item 34.

than Bahgat).  Moreover, Bahgat's misconduct resulted in losses of more than $378,000, Docket Item 44-2 at ¶ 4, and there is no question that his clients were exposed to the risk of even more substantial losses.  *See SEC v. Grenda Grp., LLC*, Case No. 1:18-cv-00954-CCR, 2022 WL 3269505, at *5 (W.D.N.Y. Aug. 11, 2022) (even where "[t]here [was] no evidence of substantial losses," finding a risk of substantial loss).  Indeed, all seven of Bahgat's clients were exposed to the risk of substantial harm when Bahgat fraudulently gained full access to their entire brokerage accounts.  So a third-tier penalty is appropriate here.

Courts have "broad discretion" in determining the penalty to impose within a given tier.  *See SEC v. Shkreli*, 15-CV-7175 (KAM) (JRC), 2022 WL 541792, at *13 (E.D.N.Y. Feb. 23, 2022).  Courts also have discretion in determining what constitutes a separate "violation" within the meaning of 15 U.S.C. § 80b-9(e).  *See SEC v. GTF Enterprises, Inc*., No. 10-CV-4258 RA, 2015 WL 728159, at *4 (S.D.N.Y. Feb. 19, 2015) (describing lack of definition in statute and different ways courts determine the number of violations).  To determine the appropriate penalty, courts consider several factors, *Haligiannis*, 470 F. Supp. 2d at 386, including (1) the egregiousness of the conduct; (2) the degree of the defendant's scienter; (3) the repeated nature of the violations; (4) the willingness to accept responsibility; (5) the loss or risk of loss caused by the conduct; (6) the level of cooperation with the authorities; and (7) the defendant's current and future financial situation.  *See Zwick*, 2007 WL 831812, at *26.

Factors (1)-(6) all weigh in favor of imposing a substantial penalty here.  As discussed above,  Bahgat's conduct was egregious and repeated, *cf. Dang*, 2021 WL 1550593, at *6 (finding the defendant's conduct egregious based on his "lies and

omissions"); *Zwick*, 2007 WL 831812, at *21 (20 fraudulent trades over 16 months considered sufficiently repetitive), and involved  a high degree of scienter*, see China Energy Sav*., 2008 WL 6572372, at *8.  He exposed multiple clients to substantial loss, and he has not demonstrated any willingness to accept responsibility or cooperate with authorities.[7]

Bahgat's current financial situation is unknown, so factor (7) is neutral. Considering Bahgat's brazenly fraudulent conduct and subsequent uncooperativeness, this Court deems the maximum $189,427 civil penalty appropriate.  This Court also finds that two separate violations occurred, one of 15 U.S.C. § 80b-6(1) and one of 80(b)-6(2).  *See Grenda*, 2022 WL 3269505, at *5 (imposing a penalty against each defendant twice, once for violating § 80b-6(1) and once for violating § 80(b)-6(2)).[8] Accordingly, Bahgat's total penalty is $378,854.

## CONCLUSION

For the reasons stated above, the SEC's motion for default judgment, Docket Item 44, is GRANTED.  It is hereby ORDERED that Tarek D. Bahgat shall pay $378,021.97 in disgorged profits and two $189,427.00 civil penalties; and it is further

ORDERED that within 14 days of this decision, the Securities and Exchange Commission may apply for a recalculated total of prejudgment interest; failing this,

---

[7] Indeed, his departure from the country and repeated efforts to avoid service demonstrate the exact opposite.

[8] Docket Item 44-3 clearly demonstrates that Bahgat violated both Advisers Act sections after November 2, 2015, making the $189,427 maximum applicable here.  *See* 17 CFR § 201.1001.

Tarek D. Bahgat shall pay $73,433.35 in prejudgment interest initially calculated by the Securities and Exchange Commission; and it is further

ORDERED that Tarek D. Bahgat is permanently enjoined from violating 15 U.S.C. §§ 80b-6(1) and (2); and it is further

ORDERED that within 14 days of this decision, the Securities and Exchange Commission shall submit a proposed judgment providing details for complying with this decision.


SO ORDERED.

Dated:   May 17, 2023
         Buffalo, New York


_/s/ Lawrence J. Vilardo_____
LAWRENCE J. VILARDO
UNITED STATES DISTRICT JUDGE